THE HONORABLE JUDGE JOHN C. COUGHENOUR

1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

8
9
10
11

N.F. by and through her mother and next friend, M.R.,

Plaintiff,

vs.

PREMERA BLUE CROSS; MICROSOFT CORPORATION WELFARE PLAN; and MICROSOFT CORPORATION,

Defendants.

Case No. 2: 20-cv-00956

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

**NOTE ON MOTION CALENDAR:**

**September 24, 2021**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
KILPATRICK TOWNSEND 75122500 1

## I.    INTRODUCTION

Defendants Premera Blue Cross ("Premera"), Microsoft Corporation ("Microsoft") and the Microsoft Corporation Welfare Plan ("the Plan") (collectively, the "Defendants") hereby move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Plaintiffs seek reimbursement from the Plan for NF's fourteen-month stay at a facility in Utah called Sunrise Residential Treatment Center ("Sunrise"). The Plan provides coverage for a wide range of mental health treatments, including Residential Treatment Centers. But the Plan allows reimbursement only when services are medically necessary. Under the Plan criteria, a 24/7 stay at a residential treatment center is medically necessary when the patient has symptoms that cannot be addressed in a community-based care setting and when the facility provides adequate psychiatric care.

Premera, and two independent reviewers, found that NF's stay at Sunrise was not medically necessary. This review was performed under procedures mandated by the Employee Retirement Income Security Act of 1974 ("ERISA") and the Patient Protection and Affordable Care Act ("Affordable Care Act") to ensure a process that is fair to plan members. NF was entitled to a Level I Appeal under the Plan's claims procedures. Premera sent the appeal to an independent child and adolescent psychiatrist who concluded that NF's stay at Sunrise was not medically necessary under the terms of the Plan. Plaintiff then submitted her claim to the Washington State Insurance Commissioner for review. The Commissioner selected a different independent child and adolescent psychiatrist to review the claims, who likewise found that NF's stay was not medically necessary under the Plan. The Defendants are bound by that decision. WAC 284-43A-150; RCW 48.43.535(8).

To prevail on her claim, NF must show that Premera's denial of benefits was arbitrary and capricious. This means that Plaintiff must show that the Defendants acted unreasonably. Plaintiff cannot meet this burden as a matter of fact or law. There is no evidence in the record that NF's stay at Sunrise for fourteen months was medically necessary, or that the Defendants acted unreasonably. The Defendants, therefore, respectfully request the Court grant summary

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 1
KILPATRICK TOWNSEND 75122500 1

judgment in their favor.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Microsoft is the Plan Administrator, and Premera is the Third-Party Administrator.

The Plan is a self-funded employee welfare benefits plan under ERISA.  Complaint, ¶¶ 1-5.  NF is a beneficiary of the Plan.  *Id.*   Microsoft is the Plan's named fiduciary and Plan Administrator.  Complaint, ¶ 4.  Pursuant to the Plan, Microsoft has delegated certain functions to Premera  including claims administration.  Complaint, ¶ 2; Declaration of G. Payton, Exhibit 1 (Summary Plan Description).  As such, both Microsoft and Premera are fiduciaries of the Plan under ERISA.  As a fiduciary, the Plan grants Premera the discretion to accept or deny claims, but the Plan remains financially responsible to pay approved claims.  *See infra* at 12-17; *see generally,* Ex. 1 (Plan, at 14-19); Complaint, ¶¶ 1-4.

### B.   NF's Treatment History.

In this action, Plaintiff seeks reimbursement for tuition, room and board for NF's fourteen-month attendance at Sunrise from May 26, 2016 through July 31, 2017.   Before enrolling at Sunrise, NF was at a wilderness program, New Vision Wilderness ("New Vision"), in Bend, Oregon, from February 12, 2016 through May 11, 2016.[1]  She then enrolled at Sunrise on May 14, 2016, where she remained until July 31, 2017 (Premera agreed to cover May 14-26 as a courtesy).  Complaint, ¶ 16.

#### 1.   NF's Treatment History Before Sunrise.

The only information regarding NF's medical history in the record before she went to New Vision and Sunrise comes from a single letter written five months after NF enrolled at Sunrise.  Julia Perry, a counselor who saw NF before she enrolled at Sunrise,  provided a "Letter of Medical Necessity," addressed "To Whom it May Concern," dated October 27, 2016, as an advocate for NF's coverage claim.  R2524-2525.  Perry says that on November 20, 2015, NF's mother, MR, contacted her to arrange counseling because she had discovered that NF "was

---

[1] Although reimbursement for New Vision is not at issue in this case, NF provided medical assessments from her treatment at New Vision to support her claim for coverage at Sunrise.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 2
KILPATRICK TOWNSEND 75122500 1

abusing large amounts of Coricidin cough medicine to get high and had lost 10 pounds." *Id.*  MR also told Perry that NF "seemed extremely distressed" about conflict between her adoptive parents, and "unresolved issues" regarding her birth parents. *Id.*

Perry met with NF on December 9 and December 15, 2015, and January 12, 26, and February 2, 2016. *Id.*  In her October 27, 2016 letter, Perry only discusses what happened after the sessions.  Perry states that despite some progress during this December 2015 to February 2016 timeframe, NF's "drug use continued to increase, continued to be frequent and placed her in physical harm." *Id.*  Thus, Perry "recommended inpatient counseling to the parents." *Id.*  She summarized the specific reasons for her recommendation as follows:

- [NF] overdosing on opiates resulting in a visit to the emergency room on 2/8/15.

- [NF] meeting criteria for Opiate Use Disorder Severe for almost 2 months.

- Increasing drug use and increasing related dangerous behaviors despite outpatient counseling.

- [NF] refusing to attend outpatient counseling or school after her overdose on 2/8/15.

- Parents reported feeling concerned about [NF]'s physical safety and that they were unable to provide 24 hour supervision because they needed to return to work, Parents reported that after 2/8/15 [NF] was unwilling to attend school and was at the house "yelling, crying, locking herself in the bathroom" or "acting catatonic."

*Id.*

### 2.    NF's Treatment History at New Vision.

According to New Vision's website, its "programs specialize in treating struggles associated with adoption, developmental trauma, anxiety, depression, and addiction" in a wilderness setting.  G. Payton Decl., Ex. 2.

While at New Vision, NF received a single psychological evaluation, from Todd Corelli, PhD, a licensed clinical psychologist.  R207.  Corelli assessed NF on April 1, 2016, about six weeks after NF enrolled at New Vision, and his report is dated April 7, 2016. *Id.*  Corelli stated in his report that NF's educational consultant referred her to Corelli.  R207.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 3
KILPATRICK TOWNSEND 75122500 1

Corelli's report does not cite or refer to any medical records.  *See* R207 *et seq.*  His evaluation is based entirely on information obtained from NF and her mother, MR.  MR reported that NF has "a history of depression, anxiety, childhood trauma, sneaking out, stealing, substance abuse, and disciplinary issues at school."  R207.  Corelli summarized information he received from NF herself as follows:

> [NF] reported she has dealt with depression for the past two years and stated it has become even more severe during the past year.  She has struggled with anxiety since childhood. [NF] admitted she was not taking her medications as prescribed in the past which had an extremely deleterious effect on her depression, anxiety, and mood while now, at [New Vision], she is taking her medications regularly which has made a clear and beneficial difference.   [NF]]reported she contemplated suicide on one occasion but considers it an aberration attributable to her abuse of Coricidin.

> She denied a history of other psychiatric symptoms. Specifically, [NF] reported no history of manic episodes, eating-disordered behaviors, dissociative episodes, or psychotic thought disturbances. She has never experienced any auditory or visual hallucinations or delusions.

R209.

NF "reported that sexual abuse by her brother, having been manipulated by her birth mother, trying to cope with the family consequences of her father's infidelity, the recent passing of her birth father, the substance abuse by her family, and being taken away from her birth family were experiences that affected her traumatically."  R210.  "She stated therapy was always very helpful to her.  She further reported that her treatment at [New Vision] has been extremely helpful."  *Id.*

NF informed Corelli that while she had experimented with various recreational drugs, "[n]ow I want nothing to do with it," except that she was continuing to use marijuana.  R210; 221.  Corelli did not identify any suicide risk, and he emphasized that "[NF] has not been violent or physically aggressive while at [New Vision]."  R210.

Corelli made the following diagnosis:

300.02 Generalized Anxiety Disorder
304.30 Cannabis Use Disorder

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 4
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

V6L .20 Parent-Child Relational Problem
315.9 Unspecified Neurodevelopmental Disorder (Executive Dysfunction)

R222. Corelli recommended that "following her discharge from [New Vision], [NF] will need to go on to a longer term residential treatment program. This program should be small, structured, nurturing, and relational. Trauma informed treatment interventions will be essential, as will individual, group, and family therapy." N222. Corelli did not address why NF could not have received these treatments on an outpatient basis.

**B.     NF's Treatment History at Sunrise.**

According to Sunrise's website, Sunrise "offers balanced programming that addresses a teen girl's therapeutic, academic, and life skills needs in a home-like setting." G. Payton Decl., Ex. 3.

NF never received any psychiatric or psychological assessment at Sunrise. There are two records that disclose NF received prescriptions of psychiatric medications, but no record that NF ever even saw a psychiatrist for prescriptions. *See* R2136; R2951. In fact, there is no evidence that NF ever received an evaluation from a psychiatrist or psychologist while at Sunrise. *See* R2136; R2951. Sunrise staff, who were not psychiatrists, reported that NF reacted well to the medications. *Id.*

Sunrise staff completed a "Master Treatment Plan" (MTP) for NF on June 3, 2016, twenty days after she enrolled at Sunrise. R951. The MTP identified "Problem Areas," "Objectives," and "Therapy Support." The MTP appears to incorporate observations from the report of Todd Corelli dated April 7, 2016, prior to NF's arrival at Sunrise. The MTP identified NF's "history of multiple traumas, developmental trauma, abuse, neglect, and recent disclosure of sexual abuse by brother." R951-R953. The MTP states that NF was suffering from "Anxiety/Depression." R951-952. The MTP identified ways that NF could learn to better process her trauma through self-reflection and identifying her past problems interacting with family, friends, and others. R951. The proposed therapy included group, individual and family counseling with Sunrise counselors (not psychiatrists or psychologists) and NF taking her medications. R951. The MTP

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 5
KILPATRICK TOWNSEND 75122500 1

does not anticipate any psychiatric intervention or psychological assessment. R952. Indeed, there are no medical records generated by a psychiatrist, licensed psychologist, or a nurse while NF was at Sunrise.

While at Sunrise, NF consistently and repeatedly denied she had ever attempted or planned suicide. R286; R412; R413 ("[NF] denies suicidal ideation/homicidal ideation."); R604 ("[NF] denies suicidal ideation/homicidal ideation and denies thoughts of self harm."); R1049 ("[NF] does not present as a current or imminent risk to herself or others."). "Her mother report[ed] she has no history of suicidal ideation." R3461. Sunrise's staff notes identify one instance of suicide ideation, on September 16, 2016, four months after NF enrolled at Sunrise. But "she had no plans to act." R479 ("[NF] talked to writer mentioning the week prior was the first time she felt like she had suicidal ideation. She mentioned she had no plans to act, more of that it was a new and weird feeling for her.").

NF's therapist at Sunrise, Craig Simpson, completed a Psychosocial Assessment (not a Psychological Assessment). *See* R141-142. Simpson is not a psychiatrist or a psychologist, but a Licensed Clinical Social Worker. *Id.* He completed his report three and a half months after NF enrolled at Sunrise. His assessment contains no new information, but appears to be a shorter paraphrase of Corelli's report while NF was at New Vision. *See id.*

NF returned home for an extended visit in June 2016. R2054. She was scheduled to return home for another extended visit in October 2016, but Sunrise canceled that visit to punish her because she kissed another female resident at Sunrise. R1355.

## C.   The Plan Covers Only Medically Necessary Treatments.

The Summary Plan Description ("SPD") describes the terms of the Plan and sets forth the requirements for coverage. R1062. The SPD provides that the Plan covers medically necessary treatment for mental health. R1255. The SPD defines "medically necessary" as follows:

> Medically necessary—A covered service or supply that meet certain criteria including:

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 6
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

- It is essential to the diagnosis or the treatment of an illness, accidental injury, or condition that is harmful or threatening to the enrollee's life or health, unless it is provided for preventive services when specified as covered under this plan.
- It is appropriate for the medical condition as specified in accordance with authoritative medical or scientific literature and generally accepted standards of medical practice.

- It is a medically effective treatment of the diagnosis as demonstrated by the following criteria:

  - There is sufficient evidence to draw conclusions about the positive effect of the health intervention on health outcome.

  - The evidence demonstrates that the health intervention can be expected to produce its intended effects on health outcomes.

  - The expected beneficial effects of the health intervention on health outcomes outweigh the expected harmful effects of the health intervention.

  - It is cost-effective, as determined by being the least expensive of the alternative supplies or levels of service that are medically effective and that can be safely provided to the enrollee. A health intervention is cost-effective if no other available health intervention offers a clinically appropriate benefit at a lower cost.

  - It is not primarily for research or data accumulation.

  - It is not primarily for the comfort or convenience of the enrollee, the enrollee's family, the enrollee's physician or another provider.

  - It is not experimental or investigational.

  - It is not recreational, life-enhancing, relaxation or palliative therapy, except for treatment of terminal conditions.

  For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature that is generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of physicians practicing in relevant clinical areas, and any other relevant factors.

R1257-1258. The SPD provides coverage for treatment at a "Residential Treatment Center," and requires "weekly physician visits": "Residential treatment center or services—Facility-based treatment providing active treatment in a controlled environment.   At least weekly physician

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 7
KILPATRICK TOWNSEND 75122500 1

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

visits are required and services must offer treatment by a multi-disciplinary team of licensed professionals." R1258.

**D.      Premera Uses Nationally-Recognized Medical Policies to Determine Whether Residential Treatment is Medical Necessary.**

The SPD notifies Plan participants that when addressing a request for coverage of a mental health treatment, Premera determines whether "the treatment plan submitted by the treating provider is medically necessary for the condition based on national, evidence-based guidelines." R1082. To determine whether extended stays (16 or more days) at a residential treatment center are medically necessary, Premera uses a Medical Policy licensed from InterQual. InterQual develops evidence-based care criteria for use by healthcare and government organizations. G. Payton Decl., Ex. 4. Premera's Medical Policy sets forth criteria that make residential treatment care medically necessary for the patient. The purpose of the criteria is to ensure that (a) the patient's symptoms are severe enough to warrant 24/7 confinement in a mental health facility and (b) the facility is providing actual psychiatric care to meet the patient's needs. Under the Interqual criteria, residential treatment is medically necessary until a patient is ready to return to community-based care.

To meet the criteria for medical necessity for a continued stay in a psychiatric residential treatment center, at least one of the following symptoms must be present within the last week:

- Disruptive behavior, defined as one of the following:
    - Physical altercation/angry outbursts
    - Destruction of Property
    - Easily frustrated *and* impulsive
    - Sexually inappropriate/aggressive/abusive
    - Runaway from facility/home pass
    - Persistent rule violations;
- Psychomotor agitation/retardation;
- Depersonalization/Derealization;

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 8
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

- Hypervigilance/paranoia;
- Psychiatric medication refractory/resistant *and* symptoms of one of the following increasing and persisting:
  - Anxiety *and* associated symptoms
  - Depressed/irritable mood *and* associated symptoms
  - Hypomanic symptoms
  - Obsessions/compulsions
  - Psychosis and associated symptoms; and
- Nonsuicidal self-injury; or
- Suicidal/homicidal ideation without intent.

G. Payton Decl., Ex. 4.  In addition, the patient must exhibit one of the following symptoms of lack of function:

- Unable/unwilling to follow instructions/negotiate needs;
- Interpersonal conflict as characterized by one of the following affects:
  - Accusatory/threatening/manipulative;
  - Hostile/intimidating;
  - Poor/intrusive boundaries; or
  - Unable to establish positive peer/adult relationships;
- Repeated privilege restriction/loss of privileges.

G. Payton Decl., Ex. 4.  Further, the patient must be receiving all of the following services while in residential treatment:

- Psychiatric evaluation at least 1 time per week;
- Clinical assessment at least 1 time per day;
- Individual/family psychoeducation;
- Individual/group/family therapy at least 3 times per week;
- Implementation of a behavioral contract/symptom management plan;
- School or vocational program; and
- For stabilized patients, a discharge plan. G. Payton Decl., Ex. 4.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 9
KILPATRICK TOWNSEND 75122500 1

In other words, an ongoing stay is covered when the patient continues to exhibit symptoms warranting residential treatment, the patient is not clinically stable for discharge, and the facility is providing adequate mental health treatment.

**E.    Plaintiffs' Claim Was Extensively Reviewed by Premera and Two Independent Psychiatrists, All of Whom Found the Stay was Not Medically Necessary.**

   **1.    Plaintiffs Sought Pre-Authorization for Sunrise, and Premera Allowed a 13-day Stay.**

On or about May 10, 2016, Sunrise requested preservice/preauthorization approval for NF's stay at Sunrise.  Premera approved coverage for a 13-day period from May 14, 2016, through May 26, 2016.  Complaint ¶ 18.

On May 26, 2016, Premera requested Sunrise to provide information and documents to explain why a continued stay was medically necessary:

> 1. Psychiatric evaluation by attending physician, initial within 1 business day, subsequent at least 1 time per wk
> 2. current meds
> 3. Individual, group, or family therapy at least 2 times per week
> 4. Preliminary discharge plan initiated within 24 hours
> Facility is also asked to verify if the following services are being provided:
> 1. Care coordination with other care providers and social services
> 2. Clinical assessment at least once per day
> 3. Structured therapeutic program at least 4 hours per day
> 4. Nursing staff on-site or on-call 24 hours per day
> 5. On-site supervision 24 hours per day

R31.  Sunrise did not provide the requested records because they did not exist.  A psychiatrist did not meet with NF upon admission to perform a psychiatric evaluation of her condition, mediations, and treatment plan.  Nor did NF get a weekly visit with a psychiatrist.  And Sunrise had not started on a discharge plan describing  the treatment and support systems NF would need after discharge.

On May 27, 2016, Premera denied coverage for NF's continuing "Mental Health Residential Treatment [at Sunrise] after 5/26/16" because "the service does not meet continued inpatient guidelines for coverage after May 26, 2016" and "this service is considered Not Medically Necessary."  R50.  Premera explained that "[t]o make this decision, we reviewed your

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 10
KILPATRICK TOWNSEND 75122500 1

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

contract, McKesson InterQual Criteria, BH: Child and Adolescent Psychiatry InterQual 2016, and the medical records your provider, Solacium Sunrise sent to us." *Id.*   Premera further explained as follows:

> The treatment guidelines we use also state that, in addition to other requirements, continued residential treatment for a mental health condition is medically necessary only when short-term treatment is planned, and when a psychiatric evaluation is being done at least one time per week. The information from your provider does not show that short-term treatment is planned. The information shows that your length of stay is expected to be 7-9 months, which is not considered to be short-term. The information also does not show that a psychiatric evaluation is being done at least one time per week. The information shows that there has been no psychiatric evaluation since you were admitted.

R51.  This Initial Decision Letter told Plaintiffs "[i]f you do not agree with our decision, you or someone you choose may file an appeal." *Id.*  It included instructions about how to file an appeal. *Id.*

### 2.    Plaintiffs' Level I Appeal.

On November 16, 2016, Plaintiffs submitted a Level I Appeal of Premera's finding that NF's treatment at Sunrise was not medically necessary.  In their appeal, Plaintiffs claimed that Premera violated ERISA because Sunrise was what they called "long term subacute care." Plaintiffs argued that "[r]esidential treatment is, by design, long-term, with average stays ranging from seven to 12 months by industry standards." R2403.   They did not otherwise challenge the medical necessity finding.

Plaintiffs included two letters with the appeal. The first was the "Letter of Medical Necessity" from Julia Perry addressed to "To Whom it May Concern." R2524-2525; see supra at 2-3.  They also submitted a second letter from Craig Simpson, who was a therapist at Sunrise. R2527.  Simpson advocated for the medical necessity of NF's confinement at Sunrise:

> This request is medically necessary during the dates of service 05114/16 -TBD for the following reasons: [NF] continues to struggle to manage her mood, emotions, and interpersonal interactions. She struggles to manage anxiety within relationships and often seeks out difficult or challenging relationships that she then becomes dependent upon. She continues to report and experience ongoing

depressive symptoms of irritability, withdrawal, and difficulty beginning or starting activities. She is impulsive, poorly tolerates distress, is argumentative, rigid in thinking and relationships, and struggles to accept feedback. She continues to require ongoing coaching in use of skills, labeling and experiencing her emotions, and managing relationships.

R2527.  Plaintiffs also submitted Todd Corelli's psychological evaluation from her stay at New Vision and notes from Sunrise staff.   R2407.

### 3.     Premera Sent the Level I Appeal to an Independent Psychiatrist Who Determined the Stay at Sunrise was Not Medically Necessary.

Premera sent Plaintiffs' Level I appeal to the Medical Review Institute of America (MRIoA) for review by Dr. William Holmes, an independent psychiatrist who is board-certified in General Psychiatry and Child and Adolescent Psychiatry.  R1187.  Dr. Holmes reviewed Premera's May 27, 2016 denial letter; Plaintiffs' Level I Appeal letter and exhibits; all of NF's records from New Vision and Sunrise; all the other materials that Plaintiffs had submitted in support of their appeal; the SPD definition of Medically Necessary; and Premera's Medical Policy.  R1184.

On March 13, 2017, the independent psychiatrist concluded as follows:

Based on the clinical information provided and the plan definition of medically necessary, the residential treatment center stay after 05/26/2016 would not be considered medically necessary for this member. . . . In this case, there is a lack of evidence of symptom severity to indicate that the continued use of residential treatment is essential for the patient's treatment. As a result, the residential treatment center level of care was no longer the most appropriate level of care, and no longer the most medically effective or cost effective treatment that was necessary in order to deliver safe and effective treatment to the patient.

R1185.  The independent psychiatrist emphasized the absence in the record of any psychiatric or psychological examination determining that NF's symptoms were so severe that NF needed to be confined at Sunrise:

The available evidence indicates concerns about the patient's mood, anxiety, and continued interest in issues surrounding substance use. However, there is no indication of severe mood related concerns, including no self-harming behavior or risk of self-harm, that would require 24 hour a day observation and treatment. There was no significant agitation, aggression, or inappropriate behavior. The patient's presentation was such that she could have been safely and effectively

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 12
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1    treated in an intensive outpatient program targeting substance use concerns. The
2    patient's co-occurring symptoms of anxiety and depression could have been safely
     and effectively treated in the outpatient setting.

3    R1185.

4        Based on this independent report, Premera denied Plaintiffs' Level I appeal on February

5    15, 2017.  R127.  Premera explained that Plaintiffs' Level I appeal was reviewed by an

6    independent physician who is board certified in Child and Adolescent Psychiatry, who concluded

7    that extended residential treatment was not medically necessary under the terms of the Plan.  *Id.*

8    The denial letter explained that while NF required treatment, she did not exhibit symptom

9    severity requiring residential treatment:  "The appeal letter provides several examples of evidence

10   related to the patient's symptoms of depression and anxiety, along with her history of struggles

11   related to substance use.  It is noted that these concerns are valid reasons for treatment. However,

12   the patients presentation for the date of service in question do not reflect a level of symptom

13   severity that would require residential treatment."  *Id.*

14       The Level I Appeal decision notified Plaintiffs that they "may choose to have Premera's

15   decision reviewed by an Independent Review Organization (IRO) by requesting an External

16   Review.  There are no fees or costs imposed as part of the External Review.  If the IRO decides

17   to overturn our decision, we will provide coverage consistent with the plan benefits (e.g.,

18   deductibles, copays, or coinsurance)."  R128.

19       **4.    A State–Mandated Independent Review Organization Denied Plaintiffs'**
20            **Claim.**

21       On February 13, 2017, Plaintiffs requested that an Independent Review Organization

22   ("IRO") review Premera's decision through a review process administered by the Washington

23   Insurance Commissioner.  Complaint ¶ 22.  Pursuant to Washington law, HHC Group, an IRO

24   certified by the State of Washington, was randomly selected by the Office of the Insurance

25   Commissioner to review Plaintiffs' claim.  *See* Wash. Admin. Code 284-43A-150.  The result of

26   this review was binding on Premera.  WAC 284-43A-150; RCW 48.43.535(8); *see also*, R1169

27   (SPD: "The external review agency decision is final and is generally binding upon the plan.").

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 13
KILPATRICK TOWNSEND 75122500 1

As part of the review process, Plaintiffs were allowed to provide any new information they wished to supplement with for the independent review and HHC Group reviewed the entire administrative record.  R1160.

HHC Group, concluded that NF's stay at Sunrise was not medically necessary after May 26, 2016:

> Patient had shown significant improvement and achieved maximum benefit from this level of care. She was nor severely disturbed in thinking or behavior to require this level of care. She had reached a baseline status and there was no reasonable expectation that her condition would further improve with continued treatment at this level of care. She was not suicidal, homicidal, or gravely impaired to care for herself. There is no evidence in the submitted medical records to indicate that she required 24-hour nursing supervision.

R1159-1160.  The anonymous independent reviewer was a Board Certified Psychiatrist with a Subcertification in Child and Adolescent Psychiatry.  R1161.

In response, Plaintiffs filed this lawsuit.

## IV. ARGUMENT

### A.  The Proper Standard of Review is Arbitrary and Capricious.

The Plan unambiguously delegates discretionary authority to Microsoft and to Premera, as its delegate.  Therefore the abuse of discretion standard applies and the Court should uphold Defendants' determination as long as it was reasonable.  Even were the Court to apply a *de novo* standard of review, NF has failed to show her stay at Sunrise was a covered benefit under the Plan, and the Court should grant summary judgment for Defendants.

### 1.  The Plan Designates Microsoft as the Plan Fiduciary and Administrator.

"Where the plan . . . grant[s] 'the administrator or fiduciary discretionary authority to determine eligibility for benefits,' . . . '[t]rust principles make a deferential standard of review appropriate.'"  *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 111 (2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963, 965 (9th Cir. 2006) ("[W]e have repeatedly held that similar plan wording—granting the power to interpret plan terms and to make final benefits determinations—

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 14
KILPATRICK TOWNSEND 75122500 1

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

confers discretion on the plan administrator.").

Here, Section 5.1 of the Plan states that the "[t]he Employer [Microsoft], shall be the Named Fiduciary and the Plan Administrator of this Plan."  Ex. 5.  Further, the Plan grants Microsoft the requisite discretionary authority to establish the abuse of discretion standard of review:

> The Plan Administrator shall have all powers necessary or appropriate to carry out its duties, including, without limitation, the sole discretionary authority to take the actions described in Section 5.2(a) and to interpret the provisions of the Plan and the facts and circumstances of claims for benefits.  Any interpretation or construction of or action by the Plan Administrator with respect to the Plan and its administration shall be conclusive and binding upon any and all parties and persons affected hereby, subject to the exclusive appeal procedure set forth in Section 5.6. Benefits under this Plan will be paid only if the Plan Administrator decides in his discretion that the claimant is entitled to them.

Ex. 5, Section 5.2 (b).

Consistent with Microsoft's obligation under ERISA, Microsoft disclosed its discretion to members through the SPD: "The Microsoft plan administrator has the exclusive responsibility and complete discretionary authority to control the operation and administration of this plan, with all powers necessary to enable it to properly carry out such responsibility, including, but not limited to, the power to construe and interpret the terms of this summary plan description and any other plan documentation." Ex. 1 at 19.

The Plan is available to all members of the Plan.  Ex. 1 at 86, 140, 194, 225, 235.  ("You may ask to examine or receive free copies of all pertinent plan documents, records, and other information relevant to your claim by asking Premera.").

**2.    Premera May Exercise Discretion to Decide Claims and Appeals where Microsoft Delegated its Fiduciary Authority**

ERISA authorizes Microsoft's delegation of authority and discretion to decide claims to Premera.  Under ERISA, a named fiduciary may delegate its fiduciary responsibilities:  "The instrument under which a plan is maintained may expressly provide for procedures ... *(B) for named fiduciaries* to designate persons other than named fiduciaries *to carry out fiduciary*

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 15
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1  *responsibilities* (other than trustee responsibilities) under the plan." *Madden v. ITT Long Term*

2  *Disability Plan for Salaried Employees*, 914 F.2d 1279, 1283–84 (9th Cir. 1990) (quoting

3  ERISA, 29 U.S.C. § 1105(c)(1) (1988) (emphasis in original).  This may occur "where (1) the

4  ERISA plan expressly gives the administrator or fiduciary discretionary authority to determine

5  eligibility for benefits or to construe the terms of the plan and (2) pursuant to ERISA, 29 U.S.C.

6  § 1105(c)(1) (1988), a named fiduciary properly designates another fiduciary, delegating its

7  discretionary authority, the 'arbitrary and capricious' standard of review for ERISA claims

8  brought under § 1132(a)(1)(B) applies to the designated ERISA-fiduciary as well as to the named

9  fiduciary." *Id.* at 1283-84.

10  Here, Microsoft delegated its authority to exercise discretion in deciding claims to

11  Premera. The Plan, at Section 5.6, specifically provides that Microsoft may delegate its claims

12  administration duties to a claims administrator:

13  > Except as otherwise set forth below or provided in an applicable insurance policy
14  > or other document incorporated by reference into the Plan, a Participant or
15  > covered dependent shall apply for Plan benefits in writing on a form provided by
   > the Plan Administrator, or in such other manner as prescribed by the Plan
16  > Administrator. . . . **Claims shall be evaluated by the Plan Administrator or
   > such other person or entity designated by the Plan Administrator as specified
17  > in the applicable Component Plans and shall be approved or denied in
   > accordance with the terms of the Plan including the Component Plans. All
18  > references to the Plan Administrator in this Section 5.6 shall include such
   > delegate.** . . . Benefits under this Plan will be paid only if the Plan Administrator
19  > decides in his discretion that the claimant is entitled to them.

20  Ex. 5 at 14-15 (emphasis added).  Section 5.6 further sets forth the claim and appeal procedure

21  that must be following prior to initiating litigation.  Ex. 1 at 15-19.

22  The Plan SPD for NF's "component plan" in turn identifies Premera as Microsoft's

23  delegate who will evaluate claims from submission of the claim through completion of the

24  internal appeal process up to the Independent Review Organization's decision, and possesses

25  complete discretionary authority to decide claims.  *See* Ex. 1 at 19 (stating that the "plan

26  administrator" has complete discretionary authority); *see also*, Ex. 1 at 16 (identifying Premera

27  as the "plan administrator"); Ex. 1 at 84-89 (describing "Premera's internal review process"):

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 16
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

The Plan SPD is incorporated into the Plan by reference.[2]  In fact, the SPD explicitly notifies members that the Plan incorporates it by reference.[3]  This is permissible under ERISA. *See Young v. United Parcel Servs., Inc. Emps.' Short Term Disability Plan*, 416 F. App'x 734, 738 (10th Cir. 2011) ("The UPS Plan expressly incorporates the terms of the SPD into the Plan by providing: 'The summary plan description and [summaries of material modifications] . . . are hereby incorporated by reference and shall constitute a part of the Plan.'"); *Tetreault v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 57 (1st Cir. 2014) ("a benefit plan may expressly incorporate its internal appeals deadline into the written instrument through a summary plan description"). While the Supreme Court has noted that the SPD often only summarizes the Plan terms and does not function as the governing Plan document, courts have clarified that the SPD may be part of the Plan by "clearly stating on its face that it is part of the Plan, as the SPD does here." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1131 (10th Cir. 2011); *see also*, *Mull for Mull v. Motion Picture Industry Health Plan*, 865 F.3d 1207, 1210 (9th Cir. 2017) (citing *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011); *Eugene S.*, 663 F.3d at 1131)). [4]

Accordingly, Premera's decisions are subject to the abuse of discretion standard because Microsoft delegated discretionary authority to it.

---

[2] "1.3 Component Plan": "'Component Plan' means a written plan identified in the Appendices and incorporated herein by reference. . . . For a self-funded plan, the written plan is the summary plan description.'" Ex. 1 at 5.

[3] "About the SPD": "This document is intended to serve as a Summary Plan Description (SPD) as defined by the Employee Retirement Income Security Act of 1974 (ERISA) for such programs described within that are governed by ERISA. The terms and conditions of the Plan are set forth in this SPD, in the Microsoft Corporation Welfare Plan wrap document (the 'Welfare Plan'), the Benefits@Microsoft Program, the Microsoft Healthcare Reimbursement Plan, the Microsoft Dental and Vision Care Reimbursement Plan, the Microsoft Dependent Care Reimbursement Plan, and in the insurance policies and other component plan documents incorporated into the Welfare Plan.  The Welfare Plan together with this SPD and the other incorporated documents constitutes the written instrument under which the Plan is established and maintained." Ex. 1 at 3.

[4] Recently the Tenth Circuit held that the Microsoft SPD failed adequately to notify Plan members of the administrator's discretionary authority to decide claims because the SPD failed to disclose Microsoft's or Premera's discretionary authority. *See Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1067–68 (10th Cir. 2020). *Lyn M.* and the case at bar involve different SPDs, and the one at issue here notifies the members of the administrator's discretion to decide claims and delegation of that function to Premera. Ex. 1 at 20, 84-89. *Lyn M.* involved an earlier version of the Microsoft SPD.  Likewise, in *A.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387, at *3 (W.D. Wash. June 5, 2018), this Court held that the plan documents failed to provide that Microsoft delegated discretionary to Premera.  That case as well involved a prior version of the plan documents.  Here, as discussed above, the plan documents explicitly provide for Microsoft's delegation of discretionary authority to Premera.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 17
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

**B.    Premera's Decision was Reasonable and in Good Faith.**

The Court must uphold Premera's decision if it was reasonable and made in good faith. "[U]nder the arbitrary and capricious standard of review, an administrator's decision 'is not arbitrary unless it is 'not grounded on *any* reasonable basis.' " *Horan v. Kaiser Steel Retirement Plan*, 947 F.2d 1412, 1417 (9th Cir. 1991) (emphasis in original).

### 1.    Premera Followed the Review Process Mandated by the Affordable Care Act and ERISA.

NF's claim has received ample due process and review.   The Affordable Care Act ("ACA") mandates a review process such as the one Premera followed here—including an independent review process—for all health plans offered in the United States.  *See* 42 U.S.C. § 300gg-19(b);  29 C.F.R.  § 2590.715-2719(c)(2)(vii)-(ix).    *Group Health Plans and Health Insurance Issuers:   Rules Relating to Internal Claims and Appeals and External Review Processes*, 76 Fed. Reg. 37,208, 37,210-11 (June 24, 2011) (codified at 45 C.F.R. pt. 147) (explaining the independent review process for self-insured plans).  Premera complied with all ACA and ERISA requirements governing the review process, including engaging an Independent Review Organization as mandated by Washington law.  R1159-1161. As discussed below, the record fully supports Premera's finding, as well as the finding of every independent reviewer who looked at the file, that the services at Sunrise were not medically necessary.    Therefore, under the arbitrary and capricious standard, the Court must uphold Premera's denial of benefits.

### 2.    The IRO Decision Shows that Premera did not Abuse its Discretion.

The Independent Review Organization selected by the Washington State Insurance Commissioner upheld Premera's determination that NF's stay at Sunrise was not medically necessary.  Premera, in turn, was bound by the IRO decision.  As this Court has recognized,  "an affirmation of an internal benefit decision by an external IRO only serves to validate the internal decision."  *Cont'l Med. Transp. LLC v. Health Care Serv. Corp.*, No. C20-0115-JCC, 2021 WL 2072524, at *3 (W.D. Wash. May 24, 2021) (citing *Peter B. v. Premera Blue Cross*, 2017 WL 4843550, slip op. at 5 (W.D. Wash. 2017) (affirming Premera's denial of residential treatment

center claim and finding that Premera's coverage determinations were consistent with Plan requirements, Premera relied on the advice of an independent physician in making its final coverage decision, there is no evidence of shifting rationales, and the IRO review validated Premera's final benefit determination."). Thus, the IRO's determination not only supports Premera's initial conclusion that the stay at Sunrise was not medically necessary, but also that Premera's conclusion was not arbitrary and capricious. *See Tracy O. v. Anthem Blue Cross. Life & Health Ins. Co.*, No. 2:16-cv-422-DB, 2017 WL 3437672, at *9 (D. Utah Aug. 10, 2017) (affirming denial of residential treatment center claim and noting that the plan's "conclusions are further supported by the independent review" of the claims); *Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 F. App'x 568, 576 (10th Cir. 2017) (noting in a disability benefit case that a decision to terminate long-term disability benefits was supported by two independent reviewers concluded that the claimant was able to work); *see also Basquez v. East Cent. Okla. Elec. Co-op., Inc.*, No. 06-cv-487 (SPS), 2008 WL 906166, at *11 (E.D. Okla. Mar. 31, 2008) (citing *Davis v. UNUM Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006)) ("[A]n administrator's decision to seek [] independent expert advice is evidence of a thorough investigation.  When an administrator ... opts to investigate a claim by obtaining an expert medical opinion—independent of its own lay opinion and that of the claimant's doctors—the administrator is going to pay a doctor one way or another.  Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a review-altering conflict.") (internal citations and quotations omitted)); *see also* John Bronsteen, Brendan S. Maher & Peter K. Stris, *ERISA, Agency Costs, and the Future of Health Care in the United States*, 76 FORDHAM L. REV. 2324-26 (2008) (explaining that external review significantly diminishes agency risk because the agent's discretion for opportunistic behavior is circumscribed by the determinations of an impartial reviewer); *Krysten C. v. Blue Shield of Am.,* No. 15-cv-02421-RS, 2016 WL 5934709, at * 4-5 (N.D. Cal. Oct. 11, 2016), *aff'd,* 721 Fed. App'x 645 (9th Cir. 2018) (granting summary judgment in favor of Blue Shield on grounds that its decision to deny coverage for continued treatment in a residential program was not medically necessary as supported by physicians' review of the claim).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 19
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

**C.     The Administrative Record Fully Supports Premera and the Independent Reviewers' Conclusion that NF's 14-month Stay At Sunrise Was Not Medically Necessary.**

> **1.     Plaintiff's Claim Fails Because there is no Psychiatric Evaluation Establishing the Medical Necessity of NF's 14-month Stay at Sunrise.**

.   Premera's Medical Policy states explicitly that, to establish residential treatment is medically necessary, the patient must be receiving all of the following services:

- Psychiatric evaluation at least 1 time per week;
- Clinical assessment at least 1 time per day;
- Individual/family psychoeducation;
- Individual/group/family therapy at least 3 times per week;
- Implementation of a behavioral contract/symptom management plan; and
- For patients who have stabilized, a discharge plan.

Ex. 4.  In other words, the facility must be providing adequate mental health treatment.  Here, NF's fourteen-month stay at Sunrise fails to comply with Premera's Medical Policy because NF was never evaluated by a psychiatrist while at Sunrise.  Premera pro-actively requested documentation of NR's psychiatric evaluations, but Sunrise never responded.  R31.  Sunrise simply does not offer the type of treatment that is required for residential treatment services to be approved as medically necessary by the Plan.

> **2.     The Record Shows NF Should Have Been Treated with a Lower Level of Care, Such as Partial Hospitalization or Outpatient Treatment, While Living in Her Community.**

The object of the InterQual Criteria, in accordance with the SPD's definition of "medically necessary," is to establish the least intensive effective level of care required to meet the patient's needs. A less-intensive level of care is a treatment provided through part- or full-time outpatient care, such as partial hospitalization or outpatient counseling.  A partial or outpatient setting can provide a substantial level of mental health treatment in a setting where the patient learns to manage stressors in her real-world community.

An element of "medically necessary" in the SPD is: "It is cost-effective, as determined by being the least expensive of the alternative supplies or levels of service that are medically

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 20
KILPATRICK TOWNSEND 75122500 1

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

effective and that can be safely provided to the enrollee.  A health intervention is cost-effective if no other available health intervention offers a clinically appropriate benefit at a lower cost." R1257-1258.   Therefore, the independent psychiatrists who reviewed Premera's denial concluded that NF could have been treated safely and effectively in a less intensive setting. R1185.  Additionally, Sunrise was providing only a minimal level of mental health treatment, as evidenced by its failure to provide a weekly psychiatric evaluation and regular mental health counseling.  Therefore, NF's "co-occurring symptoms of anxiety and depression could have been safely and effectively treated in the outpatient setting."  R1185.

The question in this case is NF's stay at Sunrise was medically necessary as a safe and effective treatment in the least intensive setting, not whether it provided some degree of benefit to her.  "The Court's inquiry requires focusing not on whether [NF] took advantage of and/or benefited from the structure and support offered in residential treatment, but, rather, whether such level of care was medically necessary."  *Doe v. Harvard Pilgrim Health Care, Inc*., No. CV 1510672, 2019 WL 3573523, *10 (D. Mass. Aug. 6, 2019); *see also, Mary D. v. Anthem Blue Cross Blue Shield*, No. 17-4195, 2019 WL 3072468, at *12 (10th Cir. July 15, 2019) ("In sum, we find that the record presents no evidence that A.D. was deteriorating or engaging in self-injurious or risk-taking behavior that couldn't be managed except in a 24-hour structured setting. He therefore fails to satisfy the injury-risk criterion.  And because the three medical-necessity criteria for residential treatment are conjunctive, we reject M.D.'s argument that A.D.'s residential treatment was medically necessary."); *Krysten v. Blue Shield of California,* No. 15-CV-02421-RS, 2016 WL 5934709, at *5 (N.D. Cal. Oct. 11, 2016), *aff'd sub nom. Krysten C. v. Blue Shield of California,* 721 F. App'x 645 (9th Cir. 2018) ("Blue Cross . . . rel[ied] on the opinions of the three physicians that Krysten had progressed to a point that residential treatment for her condition was no longer medically necessary. Krysten has shown she was still in need of treatment, but has pointed to nothing in the record sufficient to establish that only residential treatment would have been adequate for her medical needs.").

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 21
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

Defendants provides coverage for a wide range of behavioral health treatments for members like NF who need care. Ex. 1 at 58-60. In this case, a less intensive level of treatment in her own community was medically necessary, and Premera would have provided coverage for this treatment. Premera's approach of covering the least intensive effective level of care has been repeatedly upheld by courts. *See Eugene S.*, 663 F.3d at 1134 (affirming plan denial of residential treatment center care because patient met criteria for continued treatment at "a less restrictive level of care" to include "several hour[s] [per] day, multiple times [per] week [of] psychiatric evaluation and treatment including counseling, education and therapeutic interventions."); *Jon N. v. Blue Cross Blue Shield of Mass.*, 684 F. Supp. 2d 190, 201-202 (D. Mass. 2010) (affirming plan denial of residential treatment center care where plan policy to consider "psychiatric subacute care, partial hospitalization, and intensive outpatient care" and then to authorize coverage for the "least restrictive clinically appropriate setting" and "the physician reviewers determined that Patricia's case required intensive outpatient treatment, but nothing more."); *see also*, *O.D. v. Jones Lang Lasalle Med. PPO Plus Plan*, No. 1:15-CV-03285-ELR, 2017 WL 4475950, at *8 (N.D. Ga. June 12, 2017), aff'd, 772 F. App'x 800 (11th Cir. 2019) ("Given these facts and the fact that Plaintiff had never attempted a partial hospitalization program for her eating disorder and she was otherwise medically stable at the time of her admission, it was not unreasonable for United's physicians to believe that a less intensive program should first be attempted.") (citing *M.K. v. Visa Cigna Network POS Plan*, 628 Fed. Appx. 585 (10th Cir. 2015) (finding that a plan administrator's decision to deny coverage for residential treatment for an eating disorder was not unreasonable where, among other things, the plaintiff had never undergone any type of outpatient treatment for the eating disorder previously and a lower level of care, such as partial hospitalization, could assist the plaintiff with her eating disorder).

From the robust administrative record before the Court, there is no evidence to justify reimbursement for NF's fourteen-month stay at Sunrise. As Premera noted in its denial of Plaintiffs' Level I appeal, "[t]he patient's presentation was such that she could have been safely

and effectively treated in an intensive outpatient program targeting substance use concerns. The patient's co-occurring symptoms of anxiety and depression could have been safely and effectively treated in the outpatient setting."   R1185.   An independent reviewer affirmed Premera's decision during the Level I Appeal and also during the OIC-administered review.

In contrast, the court in *Dominic W. on behalf of Sofia W. v. N. Tr. Co. Employee Welfare Benefit Plan*, No. 18 C 327, 2019 WL 2576558 (N.D. Ill. June 24, 2019), noted that there was thorough and continuous evaluation and treatment by a psychiatrist who concluded that 24/7 confinement was necessary.  In that case, the patient was admitted after threatening to kill her mother, underwent a comprehensive psychiatric evaluation with a psychiatrist who specifically considered and determined that treatment in a less restrictive environment would be insufficient, received repeated formal psychiatric and psychological evaluations concluding that continued 24/7 confinement was medically necessary, and was on suicide watch five times. *Id.*  Here, there was no evaluation as to whether NF's treatment at Sunrise should continue for fourteen months or that any continued stay at Sunrise was necessary.

### 3. The "Medical Necessity" Letters and Reports from Treating Providers Lack Credibility Because they Did Not Evaluate in Real Time Whether NF's Fourteen-Month Stay was Medically Necessary.

Throughout the claims and appeals process, Plaintiff has relied on "letters of medical necessity" that were not generated as medical records, but were instead developed to support Plaintiff's claim.  Plaintiff also relies on the report from psychologist Todd Corelli, prepared while NF attended a different facility, almost two months before NF would begin at Sunrise. While Premera and the independent reviewers did read and consider these letters as part of the review process, they are not in themselves determinative of the case.

None of these reports is a psychiatric or psychological evaluation addressing whether NF's continuing stay at Sunrise was medically necessary.  Thus, there is no evidence generated at the time of NF's ongoing stay and addressing whether NF's treatment at Sunrise was medically necessary, including whether NF could be safely treated in a less restrictive community-based

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 23
KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

setting.  *See Harvard Pilgrim*, 2019 WL 3573523, at *13 ("[W]hile the Court credits Dr. Krikorian's assessment of Jane's disorders, the letter at issue does not suggest that Jane's symptomology could not be safely managed in less restrictive setting, for one example, a partial hospitalization program.").[5]

**D.      The Court Should Grant Summary Judgment Under the De Novo Standard of Review.**

Were the Court to apply the de novo standard of review here, it would not change the outcome in this case.  Even were Premera's decision reviewed de novo, the burden of proof would remain with Plaintiff to prove by a preponderance of the evidence that NF's treatment at Sunrise was medically necessary.  *See McGee v. Equicor–Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992) ("It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred.")  For all the reasons discussed above, Plaintiff cannot meet this burden of proof.  There is no evidence that NF received the level of psychiatric treatment required by Premera's Medical Policy, that Sunrise was the least intensive level of care required to meet NF's needs, or that NF ever received a psychiatric or psychological evaluation determining the medical necessity of her fourteen-month stay at Sunrise.  Premera made a correct benefits decision based on the Plan and Premera's Medical Policy and properly denied benefits on the basis of medical necessity.

**V. CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

DATED this 27th day of August, 2021.

---

[5] The Court should not give special weight to the conclusory assertions made by these treating providers.  ERISA does not require plan administrators to "accord special deference to the opinions of treating physicians," nor does ERISA place "a heightened burden of explanation on administrators when they reject a treating physician's opinion."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003); *see also*, *Garrett v. Prudential Ins. Co. of Am.*, 107 F. Supp. 3d 1255, 1265–1266 (M.D. Fla. 2015) ("Nor was it wrong to give little or no weight to the treating physicians' letters, since they were conclusory and do not take into consideration the Plan's definition of disability as it relates to Plaintiff's ability to perform the material and substantial duties of her regular occupation.") (citing *Harvey v. Standard Ins. Co*., 503 Fed. Appx. 845, 849 (11th Cir. 2013)).

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 24
KILPATRICK TOWNSEND 75122500 1

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1

2

KILPATRICK TOWNSEND & STOCKTON LLP

By_____/s/ Gwendolyn C. Payton_____
3                 Gwendolyn C. Payton, WSBA No. 26752
gpayton@kilpatricktownsend.com
1420 Fifth Ave., Suite 3700
4                 Seattle, WA 98101
Telephone: (206) 626-7714
5                 Facsimile: (206) 623-6793

6            *Counsel for Defendant Premera Blue Cross*

7

8

DAVIS WRIGHT TREMAINE LLP

By _____*/s/ Devin Smith*
9                  */s/ Christine Hawkins*
10               Devin Smith, WSBA #42219
Christine Hawkins, WSBA #44972
Davis Wright Tremaine LLP
11              929 – 108th Avenue NE, Suite 1500
Bellevue, WA  98004-4786
12              Phone: 425.646.6100
Fax: 425.646.6199
13              devinsmith@dwt.com
christinehawkins@dwt.com

14

15

*Counsel for Defendants Microsoft Corporation
and the Microsoft Corporation Welfare Plan*

16

17

18

19

20

21

22

23

24

25

26

27

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 25
KILPATRICK TOWNSEND 75122500 1

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

## CERTIFICATE OF SERVICE

I certify that on the date indicated below I caused a copy of the foregoing document, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT to be filed with the Clerk of the Court via the CM/ECF system.  In accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court will send e-mail notification of such filing to the following attorneys of record:

Megan E Glor
MEGAN E. GLOR, ATTORNEYS AT LAW
707 NE KNOTT STREET, STE 101
PORTLAND, OR 97212
503-223-7400
Fax: 503-751-2071
Email: megan@meganglor.com

Eleanor Hamburger
SIRIANNI YOUTZ SPOONEMORE HAMBURGER
3101 WESTERN AVENUE STE 350
SEATTLE, WA 98121
206-223-0303
Fax: 206-223-0246
Email: rspoonemore@sylaw.com
Email: ehamburger@sylaw.com

I affirm under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct to the best of my knowledge.

DATED this 27th day of August, 2021.

**Kilpatrick, Townsend & Stockton LLP**

By: */s/ Gwendolyn C. Payton*
    Gwendolyn C. Payton, WSBA #26752
    gpayton@kilpatricktownsend.com
    *Counsel for Defendant Premera Blue Cross*

KILPATRICK TOWNSEND 75122500 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946